IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| KELLEY BUSSARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action |
| vs. ) | No. 07-3466-CV-S-JCE-SSA |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**O R D E R**

Plaintiff is appealing the final decision of the Secretary denying his application for disability insurance benefits ["DIB"] under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and for supplemental security income benefits ["SSI"] under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), this Court may review the final decisions of the Secretary. For the following reasons, the Secretary's decision will be affirmed.

Standard of Review

Judicial review of a disability determination is limited to whether there is substantial evidence in the record as a whole to support the Secretary's decision. 42 U.S.C. § 405(g); e.g., Rappoport v. Sullivan, 942 F.2d 1320, 1322 (8th Cir. 1991). Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)). Thus, if it is possible to draw two inconsistent positions from the evidence and one

position represents the Agency's findings, the Court must affirm the decision if it is supported on the record as a whole. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

In hearings arising out of an application for benefits, the claimant has the initial burden of establishing the existence of a disability as defined by 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A). Wiseman v. Sullivan, 905 F.2d 1153, 1156 (8th Cir. 1990). In order to meet this burden, the claimant must show a medically determinable physical or mental impairment that will last for at least twelve months, an inability to engage in substantial gainful activity, and that this inability results from the impairment. Id. Once a claimant demonstrates that the impairment is so severe as to preclude the performance of past relevant work, the burden shifts to the Secretary to prove some alternative form of substantial gainful employment that claimant could perform.

The standard by which the ALJ must examine the plaintiff's subjective complaints of pain is well settled. The ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as the claimant's daily activities, the duration and frequency of pain, precipitating and aggravating factors, dosage and effects of medication, and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing the reasons for discrediting that testimony, and discussing the factors set forth in Polaski. The ALJ must give full consideration to all of the relevant evidence on the Polaski factors and may not discredit subjective complaints unless they

are inconsistent with the evidence in the record as a whole.  Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994).

## Discussion

Plaintiff, who was 39 years old at the time of the hearing before the ALJ, has a tenth grade education with special education classes.  He alleges that he is disabled because of lower back pain, and mental disorders.

At the hearing before the ALJ, plaintiff testified that although he took special education classes and only completed the tenth grade, he can read and write.  His past relevant work was as a welder, which he learned on-the-job.  He also worked as painter and sand blaster, building equipment and boat trailers.  Some of his jobs ended because the companies went bankrupt, but he left his last job as a welder because he "couldn't take the pace that they was working at, and I just couldn't, couldn't cope with myself, and I couldn't stay functioning working on their small parts. . . ." [Tr. 473].  He also had panic attacks, would start "going out of my head," and had to go outside in order to call down. [Tr. 473].  He only worked at that job a month-and-a-half.  Previously, he had worked at TI Tracker for four years.  Then, he took a year off because he felt like he couldn't get out of the house.  He felt like he was going out of his head with spells or panic attacks.  He could not be around a lot of people or in big welding shops because he would panic.  Plaintiff described the attacks as thinking he was in some other place other than the welding space, hearing voices, having to take his hood off, go into a corner, and talk to himself to calm down.  He heard a woman and child's voice in his head, but could not tell what they were saying beyond mumbling.  He left his last regular job because of his problems, but also

because he moved to Springfield to see different doctors.  He has been seeing two doctors on a regular basis since then.   Dr. Babin, the treating psychiatrist in Springfield, put him on Trileptal "to take the voices away." [Tr. 476].  Since plaintiff left his last job, he still has these spells approximately three times a week. Stress seems to be a trigger, and although his therapist, Dr. Jarvis, tells him he is not going to die during one of these attacks, he feels like he is because his heart is thumping, and his breathing is out of control.  Plaintiff testified that he almost had an attack right before the hearing, but managed to come out of it.  He takes Zyprexa Zydis for this problem, which he had to take before the hearing.  He also gets severely nauseous with these spells, and he has to get away by himself, bury his head under a pillow, and let the medicine take effect.  Plaintiff testified that there is no way to know when the spells are coming on, which is why he doesn't drive like he used to because he is afraid he will have a panic attack and have a wreck.  Plaintiff also has lower back problems, caused from a truck wreck in about 1994, where he suffered three compound fractures.  He has burning back pain most of the time, which he described as moderate.  He can't get comfortable, gets a catch in his back at times, and has problems sleeping as a result.  He tries to sleep at night, but at times everything will start spinning and he will lie awake pondering things.  He lies down during the day when his back starts bothering him or when he has a panic attack. Plaintiff has two brothers who have been diagnosed with bipolar disorders, as well as other relatives.  He also has Chronic Obstructive Pulmonary Disease ["COPD"] and asthma, where his lungs hurt, and he has shortness of breath. He stated that he takes a number of medications, but he does not have any side effects.  He does have problems concentrating and memory problems.  He feels more comfortable staying in his house because he does not want to be around people, and does not want others to see the spells

because he starts sweating and then gets sick. The spells have gotten worse since he left TI Trailers, but they started mildly in 1993. Dr. Babin indicated that they would probably get worse before they got better; he tried to put him on Xanax, but that "crippled" him for two days, so he takes Klonopin, along with the Zyprexa Zydis to try to control the attacks. [Tr. 488].

Plaintiff let his driver's license expire, although he still drives some for short trips to the store or to pick up his son from work or take a child to school. He does not drive by himself at all. His typical day is spent watching TV or trying to do little chores around the house, including laundry, and working in the garden, which has a few tomato plants and some cucumbers. The therapist recommended that he needed to do something to keep his mind focused so he does not get so sick when a panic attack happens. He no longer hunts or fishes because of the attacks. Even though he can read and write, plaintiff testified that he doubted he could read a set of blueprints now because he gets confused, and cannot stay focused. He does not read magazines or the newspaper and has never read a novel. He reads the Bible from time to time. He used to read hunting and car magazines. Plaintiff testified that he has hearing loss from his welding jobs. During the day, he has to lie down. If he was at a job with normal breaks, he would have to take an unscheduled break in the morning for about 45 minutes to an hour around 11:00 a.m. to take a Zyprexa because a panic attack will usually start between 10:00 a.m. and noon. Ordinarily, he only has to lie down once a day, but if he has a heavy attack, he might have to lie back down in the afternoon, or otherwise, he would be nauseated. He still hears voices, although the Trileptal is used to calm that down.

Plaintiff's wife testified and corroborated his statements about the problems that he has. She stated that he seemed confused and dazed during a panic attack; sometimes he shows anger

5

and it is very scary. She usually stays away from him when he has an attack. She has seen him have three attacks a week, and has observed him throwing up during them, although she does work at a daycare full-time. Plaintiff's wife testified that she tries to get him to go places with her, as simple as going to Wal-Mart or just driving around, and he gets terrified. She makes sure that he takes his medicine, and has observed him get worse if he tries not to take it as often as prescribed.

The ALJ found that plaintiff has not engaged in substantial work activity since the alleged onset date of disability, December 20, 2004. He found that the medical evidence established that plaintiff has a combination of severe impairments including: "degenerative disc disease of the lumbar spine; bronchitis/Chronic Obstructive Pulmonary Disease; schizoaffective disorder; depressive disorder; anxiety disorder with agoraphobia; and polysubstance abuse and dependence." [Tr. 18]. The ALJ found that plaintiff was not fully credible. He found that claimant did not have an impairment or combination of impairments that met or equaled one of the listed impairments. He found that plaintiff had the residual functional capacity ["RFC"] to perform a wide range of light and medium work. Therefore, it was the ALJ's finding that plaintiff is not under a disability as defined by the Act.

Plaintiff contends that the ALJ's decision should be reversed because there was not substantial evidence in the record to support his findings. He contends that the ALJ erred in the weight he gave to the treating physician, erred in his credibility determination, erred regarding the hypothetical posed to the ALJ, erred in his RFC finding, and erred in not finding that plaintiff had a listed impairment.

Plaintiff asserts that the ALJ did not consider the mental problems listed and diagnosed by all qualified medical experts as meeting the medical equivalence of the mental listings, and he erred in the weight he gave to the treating psychiatrist and other records of severe mental limitations. He asserts that the ALJ unfairly held it against him for not getting more mental health treatment when part of his diagnosis is that he has a mental disorder that precludes him from making competent decisions or even wanting to leave the house. Plaintiff asserts that the ALJ disregarded the fact that he was assessed with a GAF of 40 by his treating physician and only a 55 by the consultative psychologist. He points out that a GAF of 50 has been found to be indicative of serious symptoms or a serious impairment in social, occupational, or school functioning, as dictated by the DSM-IV. He contends that the ALJ failed to evaluate the combined effect of all his mental and physical impairments. He contends that his daily activities should not be used to determine that he does not have a disability. It is further asserted that the ALJ relied on isolated remarks in one or two reports and relied on statements taken out of context by plaintiff, who is mentally limited and has psychological deficits. Regarding plaintiff's contention that he hears voices at least three times each week, he contends that it was error for the ALJ to discount this evidence of hallucinations.

Turning first to the weight given to the opinion of the treating physician, while a treating physician's opinions are ordinarily to be given substantial weight, they must be supported by medically acceptable clinical or diagnostic data, and must be consistent with substantial evidence in the record. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999); Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004). The ALJ may reject the opinion of any medical expert if it is inconsistent with the medical record as a whole. See Bentley v. Shalala, 52 F.3d 784, 787 (8th

7

Cir. 1995). In Prosch v. Apfel, 201 F.3d 1010 (8th Cir. 2000), the Eighth Circuit Court of Appeals discussed the weight to be given to the opinions of treating physicians, holding that the opinion of a treating physician is accorded special deference under the Social Security regulations. The Court has, however, upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996).

The record indicates that plaintiff was seen before the hearing, and before mental health treatment, by a consultative clinical psychologist in 2005. Dr. Bowles concluded that plaintiff can do basic tasks; that it is likely that his mental impairments will improve with treatment; and that his condition does not meet or equal a listed impairment. He diagnosed him with anxiety attacks/anxiety-related disorder. His only marked limitation was in his ability to carry out detailed instructions. Dr. Bowles concluded that plaintiff "appears to retain the ability to understand and remember at least non-complex and possibly complex instructions, and to sustain C/P/P with at least simple tasks. He appears to retain the capacity to socially interact with limited public contact, and to adapt to at least a non-complex work environment." [Tr. 181].

Plaintiff did not seek mental health treatment until late in 2005, despite his assertion that he had suffered from panic attacks since 1993. When plaintiff first presented to Dr. Babin, the treating psychiatrist, on December 1, 2005, upon referral from his treating physician, he complained of anxiety and panic attacks, where he thinks he is dying. Plaintiff reported that he uses marijuana daily and had done so for fifteen years, and that although he drank about a month

8

previously, he was sober for five years before that. The doctor asked plaintiff to stop using marijuana. The doctor noted that he had never been hospitalized or attempted suicide; that he has had trouble with alcohol abuse and methamphetamine abuse in the past; he has been in jail twice for DWIs and domestic violence; and he has had hypomanic episodes for several years, which he describes as being unable to sleep, racing thoughts, not completing projects, and feeling irritable and restless. He also noted a family history of bipolar illness; that plaintiff was treated for coronary artery disease; that he has hypertension; has suffered fractures of the spine and has chronic back pain; and that he'd been hit in the head with a metal weapon in 1989, but did not have a skull fracture. According to the treatment records of Dr. Babin, he diagnosed plaintiff with bipolar disorder; anxiety disorder with panic attacks; and substance abuse, marijuana. He assigned him a GAF of 40. [Tr. 315]. He continued him on the medication he was currently taking, which included Prozac, Klonopin, Trileptal, Zyprexa and Zyprexa Zydis as needed for severe agitation. When Dr. Babin saw plaintiff the next month, he noted that plaintiff reported doing fairly well, although he still heard some voices. He indicated that his worry about the bills kept him awake sometimes at night. The doctor made note that plaintiff had used Zyprexa Zydis twice in the previous month for agitation. Dr. Babin increased the dosage of Zyprexa that plaintiff was to take nightly. Two months later, plaintiff reported that he was "doing great." [Tr. 311]. He only heard voices occasionally, which were apparently "not troublesome." [Id.]. The doctor noted that he had a stable mood, was not suicidal or homicidal, and was compliant with medications, tolerating them okay. He made note that plaintiff lived with his girlfriend and children, and got along well with them. Three months later, Dr. Babin noted that plaintiff was feeling anxious and nervous, and that he was having financial problems,

which seemed to precipitate the anxiety attacks. He noted that he was not having any hallucinations now, works in his garden, walks for exercise, sees a counselor once a month, and continues to take his medications. [Tr. 306]. Two months later, the doctor noted that plaintiff was "getting along okay," going to church, still has some anxiety for which he takes Zyprexa Zydis about three times a week, sleeping well, working in the garden, walking for exercise, feels good, continues with the therapy, still worries about financial problems, is not suicidal or homicidal, and continues to take his medications.[1] [Tr. 303].

     The record also contains treatment notes from Dr. Jarvis, plaintiff's therapist. The initial interview with Dr. Jarvis indicates that plaintiff was referred to him for treatment for panic attacks, which started in 1993 and have gotten worse. Dr. Jarvis made note that plaintiff experiences these attacks about three times a week; that "he says he gets paranoid, experiences shortness of breath, gets sick at his stomach and feels like he is losing control of his mind. Afterwards, he gets depressed and isolates a lot." [Tr. 307]. Dr. Jarvis noted in his treatment recommendations that plaintiff "readily agreed to treatment and we will focus on his getting out more and learning that nothing bad will happen if he does." [Tr. 309]. He also opined that plaintiff's prognosis was guarded due to the length of time that he has had these symptoms. Two months later, Dr. Jarvis noted that plaintiff was anxious, mainly about financial issues. He observed that plaintiff's panic attacks seemed to have lessened some, but they still remained; that he thought his anxiety was helped by working in the garden; he continued to isolate himself; and he thought his medications were helping.ABr. Jarvis recommended that they set some goals for the upcoming month including walking, getting out more, not isolating, and going to church.

---

[1] In these notes, the doctor referred to plaintiff as "she." Although disputed by plaintiff, the Court agrees with the ALJ that these notes do, in fact, pertain to plaintiff.

When he saw plaintiff the next month, the doctor noted that his mood was anxious, but that he had met several goals in the past month. He also noted that plaintiff reported that he had had fewer panic attacks and that they were less intense.

In the Mental Residual Functional Capacity Questionnaire, prepared in November of 2006, Dr. Babin indicated that he first saw plaintiff in December of 2005, and last saw him in August of 2006; his visits were usually every two to three months. He evaluated him with a schizoaffective disorder under DSM-IV standards, a GAF of 40, and noted that the clinical findings that demonstrated the severity of plaintiff's mental impairments and symptoms were auditory hallucinations, anxiety, and depression. Dr. Babin opined that the prognosis was "guarded." [Tr. 317]. Regarding plaintiff's symptoms, Dr. Babin listed these to include decreased energy; persistent anxiety; persistent mood disturbance or affect; difficulty thinking or concentrating; substance dependence; emotional withdrawal or isolation; bipolar syndrome; intense and unstable interpersonal relationships and impulsive and damaging behavior; hallucinations or delusions; and emotional lability. [Tr. 318]. He opined that plaintiff was severely limited in a number of areas in his mental abilities and aptitudes needed to do unskilled work, and severely limited in all areas of semi-skilled and skilled work. He also opined that plaintiff's impairments would cause him to be absent from work more than four days per month, and that they could be expected to last at least twelve months. The doctor did not complete page five of the six page checklist form, Categories of Rating Terms, 1 through 5. He did, however, sign the form on page six.

In 2007, after the hearing before the ALJ and while his application was pending, plaintiff was seen by another consultative psychological examiner, Dr. Anderson. He diagnosed plaintiff

11

with "polysubstance dependence (alcohol, marijuana, methamphetamines) reportedly in remission;" "depressive disorder NOS;" "panic disorder with agoraphobia, at least partially controlled with medication:" "R/O schizoaffective disorder;" and a current GAF of 55. [Tr. 439]. Dr. Anderson's notes indicate that he fully reviewed plaintiff's medical records, and conducted a thorough evaluation of plaintiff. He performed some memory functioning tests and evaluated the quality of plaintiff's thinking to determine his mental status. He also administered a test for recognition memory. He concluded that plaintiff appeared to be functioning in the average to possibly low average range of intelligence; that he had slightly impaired memory functions; adequate mental control; adequate remote memory for historical events; adequate quality of thinking; adequate abstract-conceptual thinking; adequate social judgment skills; and generally adequate math functions/numerical computation abilities. He concluded that "though claimant may not be able to perform welding he can understand and remember at least simple instructions without difficulty. His ability to sustain concentration, pace and persistence would appear to be adequate, for at least simple tasks. His ability to socially interact would appear adequate, though would do better with limited contact with the public. His ability to adapt would also appear adequate." [Tr. 439].

The ALJ afforded slight weight to the opinions of Drs. Babin and Jarvis, but relied instead on the opinion of Dr. Anderson, finding that his opinion was consistent with the record as a whole. The ALJ found that the medical evidence did not support the alleged severity of plaintiff's subjective complaints and functional limitations. He relied on the fact that: plaintiff has not required inpatient treatment; he has not had adverse side effects from psychotropic medications; and Dr. Babin's responses to the checklist were not consistent with or supported by

12

the actual treatment records. The ALJ noted that he therefore requested further clarification from Dr. Babin, specifically relating to clinical signs, findings, test results, or other measurements supporting his responses, but the doctor did not provide the requested information. The ALJ reviewed Dr. Babin's treatment notes, delineated herein, which indicated that plaintiff was getting along okay, working in his garden, taking Zyprexa Zydis about three times a week for anxiety, and was encouraged to get out in public more to decrease his anxiety. Additionally, the ALJ reviewed the psychotherapy notes from Dr. Jarvis, which he construed to indicate that plaintiff was improved and stable. He gave little weight to Dr. Babin's opinion of plaintiff's mental status, stating that it was not supported "by either clinical findings or rationale. It is contradicted by his own progress notes as well as the other evidence." [Id.].

The Court has carefully reviewed the records and finds that the ALJ gave legally adequate reasons for his decision not to rely on Dr. Babin's assessment of the degree of plaintiff's limitations. Under the Social Security regulations, the opinion of a treating physician is accorded special deference, and the ALJ may only discount or disregard that opinion where there is better or more thorough medical evidence, or where a treating physician's opinion is so inconsistent that it undermines the credibility of such opinions. After reviewing the record as a whole, the Court finds that there was substantial evidence to conclude that the opinions Dr. Babin rendered on the Mental Residual Functional Capacity Questionnaire were inconsistent with his treatment records and otherwise inconsistent with other medical evidence of record. It appears from the treatment notes of Dr. Babin that plaintiff's condition has improved with treatment and medication, that he does not have side effects from medication, that he is receptive to treatment, and has continued to expand his horizons beyond his home to include going to

13

church and to restaurants and visiting his wife at her workplace. The record supports the ALJ's finding that in large part, plaintiff's anxiety often centers on his concern about finances and is situational in nature. Regarding his hearing voices or having hallucinations, although plaintiff takes exception with the ALJ's conclusion that this condition was not debilitating, both Drs. Babin and Jarvis seem to have reached that conclusion in finding that the voices were not particularly troublesome for plaintiff, which conclusion was also supported by plaintiff's own testimony at the hearing. Accordingly, there is not support, in the doctor's own treatment notes, for the degree of limitation expressed on the checklist form. Additionally, the ALJ attempted to glean more information from Dr. Babin by inquiring regarding the clinical tests and other diagnostic tools that were used to reach his conclusions, and that doctor did not provide that information. Thereafter, the ALJ sought the opinion of another consultative psychological examiner, given that Dr. Bowles evaluation was conducted in 2005, before plaintiff had sought treatment. Dr. Anderson conducted a thorough evaluation, using clinical and diagnostic tools, and rendered an opinion that was more consistent with the record as a whole. The ALJ took into consideration, additionally, the fact that Dr. Babin had only seen plaintiff, for the most part, every two to three months for about a year, and plaintiff had not previously sought mental health care and treatment. It was also noted that plaintiff had never been hospitalized for mental health treatment nor had he expressed suicidal thoughts, and that the one trip to the emergency room for a panic attack also indicated that he tested positive for drugs.

After a full review of the record and the ALJ's decision, the Court finds that there is substantial evidence in the record as a whole to support the ALJ's decision that the degree of limitations suggested by Dr. Babin are not consistent with his own treatment notes, and suggest

14

greater restrictions than indicated in those notes. Further, given the fact that the opinion of Dr. Anderson was based on a full evaluation of the record as a whole, a thorough evaluation of plaintiff, and a battery of tests, the Court finds that it was not error to have assigned greater weight to that assessment. This is particularly true in a case such as this where there were differences of opinion among the medical sources. It cannot be said that the ALJ erred in his role in resolving conflicts among various treating and examining physicians, when that decision is based on substantial evidence in the record as a whole. Hudson o/b/o Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003). After a full review of the record and the ALJ's decision, the Court finds that there is substantial evidence in the record as a whole to support the ALJ's decision that plaintiff's impairments were not disabling.

Regarding the ALJ's credibility determination, the Court finds that there is substantial evidence in the record to support the ALJ's finding. In evaluating a claimant's allegations, the ALJ must consider, in addition to the medical evidence, the Polaski factors. These include prior work history, daily activities, duration and intensity of pain, effectiveness and side effects of medication, aggravating factors, and functional restrictions. Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir. 2002). Plaintiff's testimony regarding his daily activities was not consistent with a disabling condition. Further, he followed the doctor's orders in terms of getting out more, keeping himself busy, and in turn, reported that he was feeling better for the most part. Additionally, through the course of his approximate year of treatment, he extended his boundaries beyond his house to church and other activities. He also continued to drive. It is also noteworthy that plaintiff had only received treatment for about one year, that his treatment regimen basically involved medication and occasional meetings with a therapist, and

15

that there was medical evidence to suggest that his panic attacks and anxiety were situational. Additionally, there is evidence that his condition improved with medication. Further, the record indicates that while he complains of moderate back pain, the injury he suffered incurred in 1994, and he continued to work after that. There was no credible testimony or evidence to suggest that he felt he could not work because of his back problems, nor that his COPD or hypertension were not well-controlled with medication. While he contends that the ALJ did not adequately weigh his testimony, there is ample evidence of inconsistencies in plaintiff's testimony that would weigh against his credibility. These include, among other things, his contradictory assertions regarding his use of alcohol and illicit drugs, and his criminal history, as well as his degree of physical incapacity. Based on a full review of the record, the Court concludes that the ALJ detailed the reasons for discrediting plaintiff's testimony, and adequately discussed the factors set forth in <u>Polaski</u>. Therefore, the Court finds that the ALJ relied on substantial, relevant and supporting evidence in explaining his reasons for discrediting plaintiff's complaints. <u>Ghant v. Bowen,</u> 930 F.2d 633, 637 (8th Cir. 1991).

Regarding the vocational expert, plaintiff argues that the ALJ erred in failing to pose a proper hypothetical to the vocational expert because he only included certain physical limitations, and no mental limitations. He argues that the ALJ failed to consider disabling pain complaints, depression, and the diagnosed schizoid disorder with a GAF of only 40.

A review of the record indicates that in the first hypothetical posed to the vocational expert, he was asked to assume that the individual had the limitations described in the testimony. With that standard, the vocational expert testified that there was no work such a person could sustain. In the second hypothetical, the ALJ stated that the individual would be able to "lift 50

16

pounds occasionally, 25 frequently; is able to stand and walk six hours in a work day, but only 30 minutes at a time; sit six hours a day; occasionally bend, stoop. crouch, and squat, kneel, crawl, climb and balance; should avoid work with extreme background noise or work at heights or around hazardous, unprotected moving equipment, extreme temperature, humidity, dust, fumes, poor ventilation. Also assume that the person is not able to tolerate high stress, and by that I mean to rule out fast-paced activity or work that involves explicit production quotas, deadlines, or schedules, for instant piecework or that sort of thing; should not be required to adjust to changing work settings. The person should avoid or is not able to sustain a high level of concentration, sustain precision or sustain attention to detail. In this hypothetical, however, the person is able to sustain a simple routine or a repetitive task. The person must avoid frequent or prolonged personal interaction with the public and coworkers." [Tr. 500]. The vocational expert opined that such a person could perform unskilled work such as a routing clerk or a checker I.

Having carefully reviewed the record, the Court finds that the ALJ did not err in the hypothetical he posed regarding plaintiff's RFC, which clearly included mental limitations. The record indicates that the ALJ posed a hypothetical, which he found to be proper based on credible medical evidence. The vocational expert considered questions by the ALJ regarding exactly what a routing clerk does (sorts bundles of mail), which is unskilled, and has some leeway in terms of production quotas. He also testified that the reading level for a checker would be grades four through six, and that the job would not have an assembly line-production quota aspect to it. He also responded to questions by plaintiff's counsel regarding whether the jobs would have explicit deadlines and quotas, and if the math level was also considered to be

17

fourth to sixth grade. The vocational expert testified that it was, and that the restrictions imposed by the ALJ did not preclude unskilled work nor work that required carrying out a simple, routine, or repetitive task. The Court finds that there is substantial evidence in the record as a whole to support the ALJ's RFC, and to support his reliance on the opinion of the vocational expert. The vocational expert's testimony adequately responded to the hypothetical question posed by the ALJ, and the record as a whole supported a conclusion that his limitations did not prevent him from the working at the jobs identified by the vocational expert. See Hillier v. Social Sec. Admin., 486 F.3d 359, 366 -67 (8th Cir. 2007). The Court finds that the ALJ was justified in relying on the vocational expert's testimony in finding that plaintiff is able to perform other jobs in the national economy. See Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir.1991); Trenary v. Bowen, 898 F.2d 1361, 1365 (8th Cir.1990).

It should also be noted that although plaintiff contends that the ALJ did not adequately develop the record and was biased against him, the Court finds no basis for those contentions.

Based on the record before it, the Court finds that the ALJ's decision is supported by substantial evidence in the record. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). Further, plaintiff has failed to meet his burden of proving that he has an impairment that precludes him from engaging in substantial gainful activity. The Court finds that there is substantial evidence in the record as a whole to support the ALJ's decision. The ALJ's findings that plaintiff was not disabled and could perform a wide range of light and medium work are adequately supported by the record as a whole. Accordingly, the decision of the Secretary should be affirmed.

It is hereby

ORDERED that the decision of the Secretary should be, and it is hereby, affirmed.

.

                                                /s/ James C. England
                                                JAMES C. ENGLAND, CHIEF
                                                United States Magistrate Judge

Date: 2/17/09